UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JIMMY HUSPON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00062-JRS-DLP |
| | ) | |
| CORIZON MEDICAL SERVICE, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

Plaintiff Jimmy Huspon has been confined within the Indiana Department of Correction (IDOC) since 1987 and is not projected to be released until 2032. He has been confined to a wheelchair since November 2009, when he was attacked by a fellow inmate and left paralyzed from the chest down.

This action concerns the safety of the wheelchairs that were provided to Mr. Huspon between March 2016 and January 2017, while he was incarcerated at Wabash Valley Correctional Facility (WVCF). Mr. Huspon alleges that he and other inmates were consistently provided with wheelchairs of poor quality that suffered from numerous defects, culminating in a wrist injury Mr. Huspon suffered when one of the wheels fell off of his chair due to worn bearings.

Defendant Corizon Medical Service is a private entity that was contracted by the IDOC to provide medical care to inmates at WVCF. The remaining defendants—Health Services Administrator Kim Hobson, Medical Records Clerk Audra Grzelak, and Director of Nursing

Reginia Robinson[1]—were employed at that time by Corizon to provide medical care to WVCF inmates. Mr. Huspon's complaint asserts claims against all four defendants under the Americans with Disabilities Act (ADA) and the Eighth Amendment.

The action is currently before the Court on the defendants' motion for summary judgment, dkt. 38. For the reasons discussed below, the motion is **granted in part and denied in part**.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to

---

[1] Ms. Grzelak's and Ms. Robinson's affidavits indicate that their names have been misspelled on the docket. Because Ms. Grzelak will remain a defendant in the action following resolution of this motion, the **clerk is directed** to update the docket to reflect that her name is "Audra Grzelak."

2

"scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. ADA Claims

Before proceeding to the facts of the case, the Court addresses Mr. Huspon's ADA claims, which cannot proceed against these defendants as a matter of law. The operative provision of the ADA for this action is Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines a "public entity" as:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of title 49).

42 U.S.C. § 13131(1).

As individuals, Ms. Hobson, Ms. Grzelak, and Ms. Robinson obviously do not fall within the ADA's definition of "public entity." With respect to Corizon, this Court finds persuasive the recent holding that Corizon, even though it contracted with the IDOC, was a private entity and not a "public entity" for purposes of the ADA. *McIntosh v. Corizon*, No. 2:14-cv-00099-JMS-MJD, 2018 WL 1456229, at *6 (S.D. Ind. Mar. 23, 2018) ("This Court now concludes that Corizon, is not a 'public entity' for purposes of the ADA."). Therefore, the defendants' motion for summary judgment is **granted** as to Mr. Huspon's ADA claims.

## III. Eighth Amendment Claims

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted). The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

**A.  Facts**

While Mr. Huspon was imprisoned at WVCF, none of the three individual defendants had authority to determine what type of wheelchair or other medical equipment an inmate could receive. Rather, Corizon's protocols only authorized the inmate's treating physician or nurse

practitioner to make such a determination. *See* dkt. 39-3 at ¶ 3; dkt. 39-4 at ¶ 30(a); dkt. 39-5 at ¶ 29. If Ms. Robinson became aware while treating an inmate that a wheelchair seemed "inappropriate," she was authorized only to refer her concern to the inmate's treating physician or nurse practitioner. Dkt. 39-4 at ¶ 30(b). After the treating physician or nurse practitioner determined what type of wheelchair was appropriate for the inmate, Ms. Hobson ordered the wheelchair, and Ms. Grzelak distributed the wheelchair to the inmate. Dkt. 39-3 at ¶¶ 3–5; dkt. 39-5 at ¶ 29.

After Ms. Hobson ordered a new wheelchair and it arrived a WVCF, it was evaluated and, in some cases, was modified by a staff of inmate trustees to ensure that it met the prison's safety standards. Dkt. 39-3 at ¶ 6. The inmate trustees also performed wheelchair maintenance. *Id.* at ¶ 7. Maintenance intervals varied among individual wheelchairs based on how their individual users used them. *Id.* at ¶ 9. Most wheelchairs needed maintenance every three to six months, and all wheelchairs received yearly maintenance. *Id.* at ¶ 25.

In particular, wheel bearings required regular maintenance because they were commonly exposed to the elements, and exposure to the elements caused them to deteriorate. *Id.* According to Ms. Grzelak, bearings did not deteriorate suddenly, and most inmates reported issues with wheel bearings "well ahead of time" so they could be repaired and replaced without issue. *Id.*

Inmates communicated their wheelchair repair needs by submitting healthcare requests, which were received and reviewed by Ms. Grzelak. After reviewing a request, Ms. Grzelak would arrange a time for the inmate to bring the wheelchair for evaluation by a trustee. *Id.* at ¶ 7. Simple repairs, such as brake tightening, could often be completed immediately. *Id.* However, if the repair could not be completed immediately, and if the defect posed a risk of injuring the inmate, Ms. Grzelak could temporarily swap the defective wheelchair for a spare kept in the medical unit. *Id.*

5

On March 10, 2016, Mr. Huspon received a new wheelchair identified as wheelchair no. 1584. Dkt. 39-1 at 169. Mr. Huspon had requested a new chair in February 2016 after experiencing multiple problems with the brakes on his previous chair. *See id.* at 189–193.

On April 26, 2016, Mr. Huspon reported that the right foot pedal had broken off his chair, and he asked that it be repaired with a part from an old chair. *Id.* at 188. No evidence indicates that the broken pedal was ever repaired.[2]

On May 8, 2016, Mr. Huspon filed a grievance stating that, on April 28, he sustained certain injuries when he fell out of his wheelchair after it "slid from under him." Dkt. 45-1 at 12. Mr. Huspon's grievance states that the brakes had "been out for over a month" and that he had submitted a healthcare request on that subject. *Id.* However, his medical records indicate that his only previous healthcare request regarding wheelchair no. 1584 concerned the broken foot pedal and did not raise any concern regarding the brakes. *See* dkt. 39-1 at 188. Mr. Huspon met with a nurse on May 11 and with a physician, Dr. Byrd, on May 14. *See id.* at 71–80. Treatment notes from these appointments do not address the injuries Mr. Huspon described in his May 8 grievance. *See id.* Mr. Huspon's assertion that Dr. Byrd remarked during his May 14 appointment about the poor quality of his wheelchair is not reflected in Dr. Byrd's notes. *Compare id.* at 71–74 *to* dkt. 45 at 8–9.

---

[2] Ms. Grzelak asserts, without any elaboration, that the "broken foot pedal did not interfere with Mr. Huspon's use of his wheelchair." Dkt. 39-3 at ¶ 12. Because Ms. Grzelak has not explained the basis for this statement, and because no other evidence in the record supports it, the Court finds that the question of whether the broken foot pedal interfered with Mr. Huspon's use of the wheelchair is a matter beyond Ms. Grzelak's personal knowledge. As such, the Court does not find for purposes of summary judgment that the broken pedal did not interfere with Mr. Huspon's use of the wheelchair. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

On May 16, 2016, Mr. Huspon sent a letter to Ms. Robinson complaining of problems with the brakes, foot pedal, and arm rest on his wheelchair. Dkt. 39-1 at 206. Mr. Huspon concluded this letter by writing, "At any rate, I spoke to my TRUST attorney about purchasing a wheelchair and she wanted to know if it had to be purchased from McKesson[3] or some other site." *Id.* On May 20, Mr. Huspon filed a grievance complaining of the same defects. Dkt. 39-2 at 3. Mr. Huspon concluded this grievance by writing, "A better quality of chairs needs to be ordered!!! These are dangerous to paraplegics!!!" *Id.* On May 24, Ms. Robinson responded, writing that the medical department at WVCF ordered wheelchairs through Corizon's supplier. *Id.* However, she added that Mr. Huspon was free to purchase his own wheelchair, subject to inspection and clearance by the IDOC. *Id.*

On June 22, 2016, Mr. Huspon contacted Ms. Hobson with a question regarding any restrictions on specific types of wheelchair tires. Dkt. 39-1 at 184. On June 23 or 24, he submitted a healthcare request reporting that his attorney had ordered a new wheelchair and that the brakes on wheelchair no. 1584 needed to be tightened in the meantime. *Id.* at 186. The response to the request indicates that the brakes were adjusted on June 24.

On July 5, 2016, Mr. Huspon submitted a healthcare request relaying that the IDOC staff at WVCF would only permit him to use a wheelchair obtained by Corizon. *Id.* at 185. Ms. Grzelak's response indicates that a new chair was ordered for Mr. Huspon on July 8. *Id.* On July 20, 2016, Mr. Huspon received a new wheelchair, identified as wheelchair no. 0259. *Id.* at 165.

Mr. Huspon quickly encountered trouble with wheelchair no. 0259. On August 1, 2016, Mr. Huspon submitted a healthcare request reporting that the back of his chair was ripping and that his buttocks and body kept slipping through the back of the chair. *Id.* at 183. A notation on

---

[3] The Court understands McKesson to be the manufacturer of the wheelchairs Corizon supplied to inmates at WVCF.

this request states that Mr. Huspon was given a new chair in its place on August 3. *Id.* But Corizon's records show that he was placed back in chair no. 1584, which he had only handed in two weeks earlier. *Id.* at 164.

The following day, Mr. Huspon filed a healthcare request reporting a problem with the brakes on wheelchair no. 1584. *Id.* at 182. Ms. Grzelak noted that the brakes were repaired the same day. *Id.* Two weeks later, Mr. Huspon filed another request reporting that the brakes were still not functioning properly. *Id.* at 181. They were tightened two days later. *Id.* On September 22, Mr. Huspon submitted a third request for repairs to the brakes. *Id.* at 180. Ms. Grzelak documented that the brakes were adjusted the following day. *Id.*

On September 30, 2016, Mr. Huspon filed his fourth healthcare request concerning chair no. 1584 since it was reissued to him two months earlier. *Id.* at 179. In this request, Mr. Huspon reported that the right brake had broken off of the chair and indicated that the same part had broken off of this chair several times. *Id.* Mr. Huspon questioned, "Why keep ordering the same defective model?!" *Id.* He asked that Ms. Hobson investigate whether a different type of brake could be used and expressed concern that continued use of this model would result in an injury. *Id.* Staff member A. Farmer responded by noting that the brake was repaired the same day and stating that she would investigate whether a chair with different brakes would be available. *Id.*

On January 14, 2017, Mr. Huspon submitted a healthcare request stating that he was "desperately in need" of a different wheelchair. *Id.* at 224. Specifically, Mr. Huspon noted that the left front wheel had "locked up" because the bearings had worn down. *Id.* Ms. Grzelak responded on January 16 that a new chair had been ordered for Mr. Huspon. *Id.* However, she took no action to arrange for any repairs to chair no. 1584 in the interim. Moreover, she did not arrange for Mr.

Huspon to temporarily use a different chair, although she admits that a different chair was available. Dkt. 39-3 at ¶ 27.

On January 25, 2017, the left front wheel fell off of chair no. 1584 while Mr. Huspon was sitting in it, causing him to fall out of the chair and injure his wrist. Dkt. 39-1 at 176. Mr. Huspon was provided with the available spare wheelchair immediately. *Id.* at 207. On January 26, Mr. Huspon received a new wheelchair. *Id.* at 39-1.

**B.     Analysis**

Viewing the above facts in the light most favorable to Mr. Huspon as the non-movant, the Court identifies four potential injuries that could arguably be characterized as denials of Mr. Huspon's Eighth Amendment right to receive adequate medical treatment:

- Mr. Huspon was required to use a wheelchair with a broken foot pedal from April 26 through July 20, 2016. *See* dkt. 39-1 at 165, 188.

- On April 28, 2016, Mr. Huspon fell out of his wheelchair after it "slid from under him" because the brakes had "been out for over a month." Dkt. 45-1 at 12.

- Shortly after receiving it on July 20, 2016, Mr. Huspon fell through the back of wheelchair no. 0259 because its back was ripping. Dkt. 39-1 at 183.

- On January 25, 2017, the left front wheel fell off of chair no. 1584 while Mr. Huspon was sitting in it, causing him to fall out of the chair and injure his wrist. *Id.* at 176.

The Court next considers whether these injuries may be attributed to deliberate indifference by any of the four defendants.

**1.   Ms. Robinson**

Ms. Robinson's involvement in the injuries described above was limited to her receipt of and response to Mr. Huspon's May 16 letter and May 20 grievance. *See* dkt. 39-1 at 206; dkt. 39-2 at 3. Had Ms. Robinson learned while treating Mr. Huspon that his wheelchair seemed "inappropriate" for him, she would have been authorized to refer her concern to his treating

9

physician or nurse practitioner. Dkt. 39-4 at ¶ 30(b). But there is no evidence that she ever knew or should have known of any problems Mr. Huspon encountered with his wheelchair except the general complaints he presented in his letter and grievance about the low quality of the foot and arm rests and the brakes.

Individual liability under 42 U.S.C. § 1983 for a constitutional violation "requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). Ms. Robinson was involved in this matter only insofar as she received a letter and a grievance expressing generalized concerns about three parts of Mr. Huspon's wheelchair. Mr. Huspon concluded his letter by asking whether he could obtain his own wheelchair, and it was reasonable for Ms. Robinson to respond as she did—by telling Mr. Huspon how he could do so. *See* dkt. 39-1 at 206; dkt. 39-2 at 3. There simply is no evidence that Ms. Robinson failed to act in response to a known risk of harm. Therefore, the defendants' motion for summary judgment is **granted** as to Ms. Robinson, and all claims against her are **dismissed**.

**2. Ms. Hobson**

Ms. Hobson's involvement in this case is perhaps even more limited. The evidence before the Court shows that Ms. Hobson was responsible for ordering wheelchairs. But Ms. Hobson was not empowered to select a wheelchair for an inmate based on her assessment of his individual needs, or even based on her general knowledge of the quality of certain types of wheelchairs. Rather, only a physician or nurse practitioner was authorized to determine what type of wheelchair was suitable for an individual inmate, and Ms. Hobson was authorized only to purchase the type of wheelchair a physician or nurse practitioner directed her to purchase. Dkt. 39-5 at ¶ 29.

There is no evidence that Ms. Hobson had any knowledge of Mr. Huspon's particular medical condition or needs. And, even if she did, the evidence before the Court indicates that she

could not have taken any action to ensure that those needs were met. *See Board*, 394 F.3d at 478 ("[T]he defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so."). Therefore, the defendants' motion for summary judgment is **granted** as to Ms. Hobson, and all claims against her are **dismissed**.

### 3. Ms. Grzelak

Unlike the previous two individual defendants, Ms. Grzelak was directly involved in Mr. Huspon's difficulties with his wheelchairs. Ms. Grzelak was responsible for reviewing inmates' healthcare requests concerning wheelchair issues and arranging repairs. Moreover, she was authorized to temporarily swap out a defective wheelchair for a safe one when repairs could not be completed quickly. Dkt. 39-3 at ¶ 7.

The evidence before the Court indicates the existence of questions of material fact from which a reasonable fact-finder might determine that deliberate indifference by Ms. Grzelak caused at least two of the constitutional injuries noted above. First, the denial of a wheelchair with a functional foot pedal for three months could reasonably be attributed to Ms. Grzelak. The defendants do not dispute that Mr. Huspon had a serious medical need for a safe and functional wheelchair. Dkt. 39 at 11. Whether the absence of a foot pedal deprived Mr. Huspon of that need is, at minimum, an unresolved question of material fact. Ms. Grzelak's own testimony makes clear that she would have been involved in and responsible for coordinating the foot pedal's repair, and no evidence shows that she ever coordinated such repairs.

Second, a reasonable trier of fact might attribute the injuries Mr. Huspon sustained when the left front wheel fell off of chair no. 1584 to Ms. Grzelak. Mr. Huspon notified Ms. Grzelak on January 14, 2017, that he was "desperately in need" of a different wheelchair because the left front

11

wheel had "locked up" because the bearings had worn down. Dkt. 39-1 at 224. Although Ms. Grzelak was empowered to coordinate repairs to the wheelchair or provide him with the available spare wheelchair temporarily, she did neither. Dkt. 39-3 at ¶¶ 7, 27.

Ms. Grzelak argues that summary judgment is appropriate because bearings deteriorate gradually, and inmates usually reported wheel bearing issues "well ahead of time." Dkt. 39-3 at 7. As such, she argues, she did not know that Mr. Huspon faced an imminent risk of the wheel falling off the chair. After all, she had "never heard of an incident where a patient fell from a wheelchair after the wheel locked up from a bad bearing." *Id.* at ¶ 27.

Neither party has presented technical evidence about wheel bearings or their intended function on a wheelchair. But the evidence that has been presented indicates that bearings are integral to the connection between the wheel and the axle. A reasonable fact-finder might or might not find, based on that evidence, that a person familiar with wheelchairs would know that a seriously damaged bearing would present an imminent risk of the wheel separating from the axle. Further, a reasonable fact-finder might or might not infer that a person familiar with wheelchairs would know that a paraplegic sitting in a wheelchair with a seriously damaged bearing would face an imminent risk of serious injury.

While it is not clear whether a contributory-negligence defense is being raised premised on Mr. Huspon's failure to earlier report the damaged bearing, to the extent it is being raised, the Court notes that contributory negligence is not a defense to a deliberate indifference claim. *Santiago v. Lane*, 894 F.2d 218, 224 (7th Cir. 1990) ("[I]t is well settled that contributory negligence is not a defense to an allegation of intentional or reckless conduct."). More important, Mr. Huspon's healthcare request did not convey that he was reporting early-stage wear to his bearing. Rather, he stated that he was "desperately in need" of a new chair because his bearing

had already worn to the point where the wheel had "locked up." Dkt. 39-1 at 224. If this did not alert Ms. Grzelak to an imminent risk that the wheel would become separated from his axle, a reasonable fact-finder could find that it at minimum notified her that the chair was not functioning properly and thereby was depriving Mr. Huspon of what the defendants concede was a serious medical need—the use of a safe and functional wheelchair.

Equipped with that information, Ms. Grzelak did not assess the progression of the bearing's wear, arrange for repairs, or provide Mr. Huspon with a different wheelchair temporarily. Instead, she "decided not to do anything to prevent that harm from occurring even though [she] could have easily done so"—this could be found to be deliberate indifference. *Board*, 394 F.3d at 478. Because material issues remain for trial, the defendants' motion for summary judgment is **denied** as to Mr. Huspon's Eighth Amendment claim against Ms. Grzelak.

### 4. Corizon

Because Corizon acted under color of state law by contracting to perform a government function—providing medical care to state correctional facilities—Corizon is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). To prevail, Mr. Huspon must show that Corizon had: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice so widespread that, although not authorized by written or express policy, was so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that his constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004). In addition, the failure to make policy itself may be actionable conduct. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

Mr. Huspon has not presented any evidence of a written or express policy, nor has he identified a person with final policy making authority as the cause of his injuries. Instead, he has attempted to demonstrate a widespread practice of providing disabled inmates with defective wheelchairs. To prove a widespread practice, a plaintiff "must show more than the deficiencies specific to his own experience, of course." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016). Although Mr. Huspon's own difficulties with wheelchairs provided by Corizon were extensive, he has not supported his practice claim with admissible evidence that other inmates have experienced similar difficulties.

Mr. Huspon has presented four affidavits from fellow inmates stating that they are provided wheelchairs that are of low quality and that are regularly in disrepair. However, these affidavits do not clearly concern wheelchairs supplied by Corizon.

It is undisputed that Corizon's contract with the IDOC ended on April 1, 2017, and that Wexford began providing medical services to inmates at that time, albeit while employing the former Corizon personnel. The affidavits Mr. Huspon has presented are dated August 9 and 10, 2017, and May 7, 2018. Dkt. 45-1 at 8–9, 36. The fourth affidavit is undated, but the Court presumes it was created in a similar timeframe. *Id.* at 10. Indeed, all four affidavits are written in the present tense. One affiant specifically identifies Wexford as the supplier of his wheelchair. *Id.* at 26. Only one affiant specifically names Corizon, but he describes a situation he encountered with his wheelchair in 2018—well after Wexford had taken over. *Id.* at 36. Although Wexford's use of former Corizon employees to provide services exposes those employees to potential individual liability for events alleged to have taken place after April 1, 2017, such continued employment by Wexford does not provide a legal basis to hold Corizon, the former service provider, legally responsible as a corporate entity.

Simply put, Mr. Huspon has not presented any relevant evidence beyond his own experiences of a widespread Corizon practice of providing defective wheelchairs. Mr. Huspon notes that many of the same healthcare professionals who worked at the prison under Corizon continue to work there under Wexford. The Court understands that, from the vantage point of an inmate, the distinction between Corizon and Wexford may be trivial. But they are separate companies, and the Court may not enter a legal judgment against Corizon based on Wexford's practices. Therefore, the defendants' motion for summary judgment is **granted** as to Corizon, and Mr. Huspon's Eighth Amendment claim against Corizon is **dismissed**.

## V. Conclusion

The defendants' motion for summary judgment, dkt. [38], is **granted** insofar as Mr. Huspon's ADA claims against all four defendants and his Eighth Amendment claims against Ms. Robinson, Ms. Hobson, and Corizon are **dismissed**. The **clerk is directed** to terminate Ms. Robinson, Ms. Hobson, and Corizon as parties on the docket. No partial final judgment shall issue at this time.

The motion is **denied** insofar as this action shall continue with an Eighth Amendment claim against Ms. Grzelak. The **clerk is directed** to update the docket to reflect that her name is "Audra Grzelak." The Court will issue a separate Order directing further proceedings in this action.

**IT IS SO ORDERED.**

Date: 1/4/2019

*James R. Sweeney*
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JIMMY HUSPON
870574
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com